IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| **OMNIACTIVE HEALTH TECHNOLOGIES LTD.,**<br><br>Plaintiff,<br><br>v.<br><br>**BIO-GEN EXTRACTS PVT. LTD.,**<br><br>Defendant. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

1. Plaintiff OmniActive Health Technologies Ltd. ("OmniActive"), by and through its undersigned counsel, files this Complaint against Defendant Bio-gen Extracts Pvt. Ltd. ("Bio-gen"), and alleges as follows:

**NATURE OF THE ACTION**

2. This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq.* Plaintiff seeks relief because Defendant has actively induced the infringement of, and has made clear that it intends to imminently further actively induce the infringement of, Plaintiff's U.S. Patent No. 10,532,035 (the "'035 Patent").

3. OmniActive is an industry leader in providing innovative, scientifically validated, and nature-based ingredients to the evolving natural products industry. OmniActive has invested substantial time and resources in researching and developing methods to extract, purify, improve, and manufacture naturally derived ingredients and compounds that may be used to improve human

health. OmniActive has also expended considerable resources in studying the efficacy of its products and developing methods by which they can be beneficially administered and used.

4. OmniActive's innovations are protected by numerous patents and other intellectual property rights in the United States and throughout the world, including the '035 Patent.

5. Among OmniActive's innovations is a novel method of administering lutein and zeaxanthin isomers derived from marigold to improve visual function. The '035 Patent contains claims directed to these methods and compositions used therein.

6. Bio-gen makes and sells Lute-gen®, a compound containing lutein and zeaxanthin isomers that are derived from marigold and present in the same ratio as the compounds administered according to the claims of the '035 Patent. Despite having direct and active knowledge of the '035 Patent, Bio-gen actively induces physicians, other healthcare and nutrition professionals, and other customers or end users in the United States to infringe at least one claim of the '035 Patent through its marketing and promotion of Lute-gen®, including at least by repeatedly touting the purported benefits of administering Lute-gen® to improve visual health and clinical studies allegedly supporting these benefits.

## THE PARTIES

7. OmniActive is a public limited company organized and existing under the laws of India. OmniActive has its principal place of business at Unit No. T-8b, 5th Floor, Phoenix House, Phoenix Mills Compound, 462, S B Marg, Lower Parel, Mumbai, MH 400013, India.

8. OmniActive is the assignee of all rights, title, and interest in and to the '035 Patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '035 Patent. Accordingly, Plaintiff possesses the exclusive right and standing to prosecute the present action.

9. On information and belief, Defendant Bio-gen is a private limited company, organized and existing under the laws of India, and having a principal place of business at Bio-gen House, 254/1-9, 3rd Floor, 11th Main Road, 3rd Phase, Peenya Industrial Area, Bengaluru 560 058, Karnataka, India.

## JURISDICTION AND VENUE

10. This is a civil action for patent infringement arising under Title 35 of the United States Code, and for declaratory relief under Title 28 of the United States Code.

11. This Court has jurisdiction over the subject matter of this action pursuant to at least 28 U.S.C. §§ 1331, 1338, 2201, and 2202, and 35 U.S.C. § 1 *et seq.* This Court further has jurisdiction under 28 U.S.C. § 1367 over OmniActive's claims for declaratory relief as so related to OmniActive's claims for patent infringement that they form part of the same case and controversy under Article III of the United States Constitution.

12. This Court has personal jurisdiction over Bio-gen because, *inter alia*, on information and belief, Bio-gen has continuous and systematic contacts with the State of Texas, regularly conducts business in the State of Texas, either directly or through one or more wholly owned subsidiaries, agents, and/or alter egos, has purposefully availed itself of the privilege of doing business in the State of Texas, sells, imports, and intends to import or sell Bio-gen's infringing Lute-gen® product in the State of Texas, and has induced and has made clear that it intends to continue to induce physicians, other healthcare and nutrition professionals, and other customers and end users of Lute-gen® in Texas to administer or use Lute-gen® in a manner that infringes one or more claims of the '035 Patent.

13. In the alternative, this Court has personal jurisdiction over Bio-gen because the requirements of Federal Rule of Civil Procedure 4(k)(2) are met as (a) OmniActive's claims arise under federal law; (b) Bio-gen is a foreign defendant not subject to general personal jurisdiction

in the courts of any state; and (c) Bio-gen has sufficient contacts with the United States as a whole, including, but not limited to, importing and/or offering to sell, or selling, products that are distributed throughout the United States, such that this Court's exercise of jurisdiction over Bio-gen satisfies due process.

14.   On information and belief, Bio-gen knows and intends that the infringing Lute-gen® product is marketed, used, distributed, offered for sale, or sold in the United States and within the State of Texas, and physicians, other healthcare and nutrition professionals, or other customers or end users of Lute-gen® in the State of Texas have administered or used, or will administer or use Lute-gen®, in a manner that infringes at least one claim of the '035 Patent.

15.   Venue is proper in this Judicial District as to Bio-gen pursuant to 28 U.S.C. § 1391(c)(3) and 28 U.S.C. § 1400(b) at least because Bio-gen is a foreign company.

## BACKGROUND FACTS

**I.   OmniActive's Lutemax 2020 product and '035 Patent are innovative breakthroughs in the natural products space.**

16.   OmniActive was founded in 2003 and is an industry leader in delivering high-quality, scientifically validated, and nature-based compounds for customers in the dietary supplement, functional food, and beverage markets.

17.   One of OmniActive's flagship products is Lutemax 2020, a proprietary extract of lutein and zeaxanthin isomers derived from marigold flowers. Lutemax 2020 is an award-winning product that can be formulated into a variety of foods, beverages, and supplements to deliver lutein and zeaxanthin isomers with high bio-availability.

18.   Lutein and zeaxanthin isomers (R,R-zeaxanthin and meso-zeaxanthin) are carotenoid compounds found in high concentrations in the macula lutea of the retina. These compounds are potent antioxidants and are associated with several health benefits, including

improved visual health and performance, sleep quality, skin health, cognitive functioning, and stress and mood support.

19. Lutein and zeaxanthin isomers have garnered particular attention for their role in preserving healthy vision, improving visual function, and alleviating visual ailments, including visual discomfort, stress, and strain. Humans cannot synthesize lutein and zeaxanthin isomers, so they must be acquired through diet or supplementation. Though these compounds are found naturally in certain foods, there is a growing consensus that supplementation with these compounds may be necessary under certain conditions to preserve and improve visual health. Supplementation may be especially important due to age, lifestyle factors, poor dietary intake, or increased exposure to blue light.

20. "Blue light" refers to the portion of the visible light spectrum with the shortest wavelengths and highest energy. Blue light is emitted from many sources, including artificial sources such as computer and cell phone screens and LED lights. Prolonged exposure to blue light has been shown to damage the retina—leading to discomfort, decreased visual health and function, and disrupted sleep. Lutein and zeaxanthin isomers act as natural blue light filters in the macula, thereby protecting the retina from the harmful effects of blue light.

21. Lutemax 2020 is manufactured using a proprietary extraction process that results in a lutein:zeaxanthin isomers ratio of 5:1. Lutemax 2020's effectiveness in improving visual function and mitigating the effects of blue light exposure is backed by multiple clinical studies.

22. The '035 Patent is entitled, "Methods for Improvement of Visual Function and Compositions Used Therein." The '035 Patent was duly and legally issued on January 14, 2020. A true and correct copy of the '035 Patent is attached as Exhibit A.

23. OmniActive, as the assignee, owns the entire right, title, and interest in and to the '035 Patent. OmniActive has the right to enforce the '035 Patent.

24. The '035 Patent represents a significant breakthrough in improving visual health and function using naturally derived compounds. The '035 Patent discloses and claims methods of improving visual function in a subject by administering a daily dose of marigold-derived lutein and zeaxanthin isomers in specified amounts and ratios. In particular, the '035 Patent teaches that daily supplementation of lutein and zeaxanthin isomers in a 5:1 ratio—with zeaxanthin isomers ((R,R)-zeaxanthin and meso-zeaxanthin) present in the range at or about 20:80 (R,R)-zeaxanthin:meso-zeaxanthin to about 80:20 (R,R)-zeaxanthin:meso-zeaxanthin—leads to increased macular pigment optical density and improvements in critical flicker fusion frequency and contrast sensitivity.

25. Macular pigment optical density is a measure of the concentration of macular pigment in the eye. Increased macular pigment optical density is positively correlated with an increase in contrast sensitivity and critical flicker fusion frequency.

## II. Bio-gen imports and sells a lutein-zeaxanthin compound with the same carotenoid composition as Lutemax 2020.

26. Bio-gen makes, sells, and offers Lute-gen® for sale. Bio-gen represents on its website that it sells its products, including Lute-gen®, to the United States market. *See* https://bio-gen.in/company/.

27. On information and belief, Bio-gen's customers utilize Lute-gen® as an ingredient in nutritional supplements and nutraceutical products that are sold to the United States market.

28. As one example, Sports Research Corporation sells a Lutein + Zeaxanthin isomers supplement that is formulated with Lute-gen®. Sports Research Corporation's product page for its Lutein + Zeaxanthin isomers supplement contains dozens of product reviews from "Verified

Buyers" in the United States, which confirm that Lute-gen® is actively being sold to the United States market. *See* https://www.sportsresearch.com/products/lutein-zeaxanthin/.

29. Bio-gen represents on its website that a daily dose of Lute-gen® contains 10 mg lutein and 2 mg zeaxanthin isomers (i.e., a 5:1 lutein:zeaxanthin isomer ratio) derived from marigold.

30. Lutein and zeaxanthin isomers are the only purported active ingredients in Lute-gen®. Thus, Bio-gen represents that Lute-gen® has the same carotenoid compounds, and the same ratio of carotenoid compounds, as in OmniActive's Lutemax 2020 product.

31. On information and belief, Lute-gen® contains zeaxanthin isomers in a range of about 30:70 (R,R)-zeaxanthin:meso-zeaxanthin, which is within the recited range of zeaxanthin isomers of at least one claim of the '035 Patent.

### III. Bio-gen actively induces others in the United States to administer Lute-gen® in a manner that directly infringes one or more claims of the '035 Patent.

32. Bio-gen claims that Lute-gen® will enhance visual performance, and specifically claims that Lute-gen® will increase macular pigment optical density, maintain central foveal thickness, and protect against blue light and oxidative damage. Bio-gen references and touts clinical studies, which are featured prominently throughout Bio-gen's website and marketing and informational materials for Lute-gen®, in support of these purported benefits for visual health.

33. One such study specifically endorsed and featured by Bio-gen is A.L. Lopresti & S.J. Smith, *The effects of lutein / zeaxanthin (Lute-gen®) on eye health, eye strain, sleep quality, and attention in high electronic screen users: a randomized, double-blind, placebo-controlled study*, Front. Nutr. 12:1522302, doi: 10.3389/fnut.2025,1522302 ("Lopresti").

34. Bio-gen is specifically identified in Lopresti as a funder of the Lopresti study.

35. On information and belief, Bio-gen funded the Lopresti study in order to bolster its claims that supplementation with Lute-gen® would improve outcomes for individuals suffering from visual fatigue and other eye health issues, including visual performance, dry eyes, and eye strain. *See, e.g.*, https://www.nutraingredients-asia.com/Article/2025/02/27/australian-study-finds-lutein-zeaxanthin-supplementation-in-high-screen-time-users-could-improve-dry-eyes-macular-function/.

36. The Lopresti study evaluated the effects of administering Lute-gen® to individuals suffering from visual discomfort and eye strain from exposure to electronic screens (i.e., blue light).

37. The Lopresti study disclosed and discussed a treatment regimen for Lute-gen® in which a daily dose of Lute-gen® (10 mg lutein and 2 mg of zeaxanthin isomers) was administered to subjects who devoted at least 6 hours per day to viewing a screen at a distance of 1 meter or less (i.e., subjects who have been exposed to light of varying wavelengths and intensity, including blue light) and completed a questionnaire assessing symptoms of eye discomfort following a typical workday (i.e., subjects suffering from visual fatigue).

38. To assess the effectiveness of the Lute-gen® treatment, the Lopresti study measured, among other things, differences in the subjects' contrast sensitivity and photostress recovery time at the end of the 180-day treatment period compared to the subjects' baseline measurements.

39. Lopresti reported statistically significant improvements in photostress recovery time for the treatment group that received Lute-gen®, relative to the placebo group, at the end of the 180-day treatment period.

40. An individual in the United States who administers or uses Lute-gen® according to the regimen disclosed in Lopresti would directly infringe at least one claim of the '035 Patent.

41. Further, Bio-gen hosted a presentation for industry professionals at SupplySide West (a prominent tradeshow in the United States for the health and nutrition industry) on October 30, 2024 with Dr. Adrian Lopresti—the author of Lopresti.

42. In that presentation, Bio-gen and Lopresti presented findings of recent clinical trials exploring the effects of Lute-gen® on, among other things, visual health and blue light protection.

43. By sponsoring and hosting the presentation by Dr. Lopresti, Bio-gen intended to convince its customers in the United States, including health and nutrition professionals, of Lute-gen®'s purported benefits on visual health, including alleviation of visual fatigue and eye strain, when administered in the manner disclosed in studies such as Lopresti.

44. By funding and prominently promoting and publicizing clinical studies, such as Lopresti, that purportedly support Bio-gen's claims of Lute-gen®'s asserted benefits on visual health, Bio-gen knew and intended that physicians, other healthcare and nutrition professionals, or customers or other end users of Lute-gen® in the United States would refer to and consult the studies featured on Bio-gen's website, marketing materials, and other Lute-gen® product information in determining whether and how to administer Lute-gen®.

45. For example, Sports Research Corporation's Lutein + Zeaxanthin supplement is formulated with Lute-gen®.

46. Product reviews and testimonials from customers and consumers of this supplement reveal that customers and end users in the United States are indeed using Lute-gen® as

recommended by their doctors. For example, the following reviews were posted by "Verified Buyers" of Sports Research Corporation's Lutein + Zeaxanthin supplement in the United States:[1]



47. Other "Verified Buyers" of Sports Research Corporation's Lutein + Zeaxanthin supplement in the United States report taking the supplement to alleviate visual fatigue and improve visual health:





---

[1] https://www.sportsresearch.com/products/lutein-zeaxanthin.







48.  Reviews from U.S.-based purchasers of Sports Research Corporation's Lutein + Zeaxanthin isomers supplement from Amazon.com likewise report that their physicians recommend using the Lute-gen®-formulated supplement:[2]



---

[2] https://www.amazon.com/Zeaxanthin-Absorption-Certified-Verified-Softgels/dp/B07DFRQFQT?th=1.

49. The reviews and testimonials referenced in the preceding paragraphs confirm that healthcare providers in the United States are administering Lute-gen®, and end users of Lute-gen® in the United States are using Lute-gen®, in order to improve visual function including to alleviate suffering from visual fatigue.

50. At least some of the individuals in the United States who used or were treated with Lute-gen® suffered from visual fatigue in the form of visual discomfort, visual stress, and affected sleep quality.

51. At least some of the individuals in the United States who used or were treated with Lute-gen® were exposed to light of varying wavelengths and intensity, such as blue light.

52. At least some of the individuals in the United States who used or were treated with Lute-gen® were administered a daily dose of macular carotenoids (i.e., lutein and zeaxanthin) in an amount effective to enhance critical flicker fusion frequency, contrast sensitivity, and macular pigment optical density relative to a similarly situated subject who was not administered such macular carotenoids (i.e., lutein and zeaxanthin).

53. On information and belief, at least some of the individuals in the United States who used or were treated with Lute-gen® measured at least one parameter from the group consisting of contrast sensitivity, disability glare, visual processing speed, and photostress recovery in order to evaluate an improvement in visual function of the subject who used Lute-gen®.

54. On information and belief, Bio-gen knew and intended that its marketing materials and product information for Lute-gen®, including their promotion and touting of clinical studies purportedly supporting Bio-gen's health claims for Lute-gen®, would induce others, including physicians, other healthcare and nutrition professionals, and customers or other end users of Lute-

gen® in the United States, to use and administer Lute-gen® to improve visual function in a manner that infringes at least one claim of the '035 Patent.

**IV.  Bio-gen has acted with direct and actual knowledge of the '035 Patent.**

55. Despite knowledge of the '035 Patent, Bio-gen sold, offered for sale, and imported Lute-gen® into the United States and—by prominently publicizing, touting, and relying on clinical studies in support of Lute-gen®'s purported effectiveness in improving visual health—induced and intends to further induce infringement of at least one claim of the '035 Patent by encouraging and instructing physicians, other healthcare and nutrition professionals, or other customers or end users of Lute-gen® to administer or use and evaluate the effectiveness of Lute-gen® in the manner disclosed in such clinical studies, including Lopresti.

56. Bio-gen, by its own admission, is and has been well-informed of OmniActive's intellectual property rights. OmniActive sent a letter to Bio-gen on July 26, 2023 in response to misleading claims made regarding Lute-gen® being "the only cost-effective, clinically-proven and globally-compliant lutein-zeaxanthin in the market." In its August 21, 2023, response through counsel, Bio-gen agreed to take down the misleading claims and insisted that Bio-gen was "aware and well informed about the intellectual property rights" of OmniActive.

57. As evidenced by Bio-gen's admission in its August 21, 2023 letter, Bio-gen was aware of OmniActive's '035 Patent and the several benefits on visual function that may be obtained through administering lutein and zeaxanthin-isomers compounds as described and claimed in the '035 Patent.

58. On information and belief, Bio-gen intended to gain a competitive advantage by representing that Lute-gen® and methods of using and administering Lute-gen® have the same beneficial effects on visual function discovered by OmniActive and claimed in the '035 Patent.

59. On information and belief, Bio-gen devised and designed its marketing strategy, marketing materials and product information for Lute-gen®, including their funding, promotion, and touting of clinical studies that purportedly support Bio-gen's health claims for Lute-gen®, with knowledge of the '035 Patent and with the intent to misappropriate and exploit OmniActive's innovative methods claimed in the '035 Patent.

60. On information and belief, Bio-gen knowingly and intentionally induced others, including physicians, other healthcare and nutrition professionals, and customers or other end users of Lute-gen® in the United States, to use and administer Lute-gen® to improve visual function in a manner that infringes at least one claim of the '035 Patent in order to make Lute-gen® a more attractive product to U.S. consumers and thereby divert U.S. consumers away from OmniActive's Lutemax 2020 product.

61. On April 1, 2025, promptly upon learning of Bio-gen's ongoing conduct to induce infringement of the '035 Patent, OmniActive sent a cease and desist letter, through its counsel, to Bio-gen and its exclusive North American distributor, Nutralliance, Inc. ("Nutralliance"). This letter set forth the basis of Bio-gen's active inducement of infringement of the '035 Patent, and requested a response within 30 days of the date of the letter.

62. OmniActive did not receive an acknowledgement of or response to its letter until May 1, 2025. The initial response did not substantively engage with any of the points raised in OmniActive's letter, and instead indicated that Bio-gen and Nutralliance "are reviewing [the] letter and will respond in due course."

63. Bio-gen and Nutralliance responded further on May 13, 2025. The responsive letter did not contain any affirmative evidence of non-infringement, nor did Bio-gen or Nutralliance

express any willingness to further discuss the issue with OmniActive or cease infringing the '035 Patent.

64. OmniActive had offered in its letter to further substantiate its infringement allegations with its internal analysis of the Lute-gen® product on a non-waiver basis, and Bio-gen and Nutralliance did not take OmniActive up on that offer.

## COUNT 1
## INFRINGEMENT OF THE '035 PATENT

65. OmniActive states, realleges, and incorporates by reference the foregoing paragraphs as if fully set forth herein.

66. Within the six years preceding the filing of this Complaint, Bio-gen has actively induced infringement of at least one claim of the '035 Patent, either literally or under the doctrine of equivalents, through Bio-gen's commercial manufacture, use, offer for sale, or sale within the United States, or importation into the United States of Lute-gen® and at least the conduct set forth in the preceding paragraphs. *See* 35 U.S.C. § 271(a), (b), and (c).

67. Unless enjoined by this Court, Bio-gen will continue to make, use, offer for sale, or sell Lute-gen® within the United States, or will import Lute-gen® into the United States, and actively encourage physicians, other healthcare and nutrition professionals, and other customers or end users of Lute-gen® to administer or use Lute-gen® according to one or more claimed methods of the '035 Patent. Bio-gen will thereby continue to induce the infringement of one or more claims of the '035 Patent. *See* 35 U.S.C. § 271(a) and (b). In addition, on information and belief, Bio-gen will encourage acts of direct infringement with knowledge of the '035 Patent and knowledge that it is encouraging infringement.

68. Without limiting the foregoing, Bio-gen has actively induced the infringement of at least Claim 1 of the '035 Patent as described in the Claim Chart attached hereto as Exhibit B.

69. Bio-gen's acts of making, using, selling, offering for sale in the United States, and/or importing Lute-gen® into the United States have been without license, permission, or authorization from OmniActive.

70. Bio-gen's acts to induce infringement of the '035 Patent have injured and continue to injure OmniActive. OmniActive is therefore entitled to a money judgment in an amount adequate to compensate for Bio-gen's infringing activities, including compensation for OmniActive's lost profits, but in no event less than a reasonable royalty together with interests and costs as fixed by the Court. OmniActive will continue to suffer damages in the future unless Bio-gen's infringing activities are enjoined by this Court.

71. Bio-gen's infringing activities are willful, intentional, and culpable. Upon information and belief, Bio-gen has engaged, and is continuing to engage, in infringing activity despite an objectively high likelihood that its actions constitute or actively induce infringement of a valid patent. OmniActive is therefore entitled to enhanced damages for Bio-gen's conduct to induce the infringement of one or more claims of the '035 Patent.

72. OmniActive will be irreparably harmed if Bio-gen and its agents, servants, employees, representatives, affiliates, and all others acting in active concert therewith are not enjoined from actively inducing the infringement of the '035 Patent. OmniActive does not have an adequate remedy at law, and considering the balance of hardships between OmniActive and Bio-gen, a remedy in equity is warranted. Further, the public interest would not be disserved by the entry of a permanent injunction.

73. OmniActive's claims also arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

74. OmniActive is entitled to relief not only for Bio-gen's past induced infringement, but also Bio-gen's imminently threatened conduct to further induce infringement of one or more claims of the '035 Patent.

75. As a result of the foregoing facts, there is a real, substantial, and continuing justiciable controversy between OmniActive and Bio-gen concerning liability for the infringement of the '035 Patent for which this Court may grant declaratory relief consistent with Article III of the United States Constitution.

76. This case is exceptional, and OmniActive is entitled to an award of attorneys' fees under 35 U.S.C. § 285.

## JURY DEMAND

77. Under Rule 38(b) of the Federal Rules of Civil Procedure, OmniActive respectfully requests a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, OmniActive respectfully requests the following relief:

(a) The entry of a judgment, in favor of OmniActive and against Bio-gen, that Bio-gen has induced others to infringe one or more claims of the '035 Patent;

(b) An award of damages pursuant to 35 U.S.C. § 284 for Bio-gen's past and continuing induced infringement, up until the date such judgment is entered with respect to the '035 Patent, including pre- or post-judgment interest, costs, and disbursements as justified under 35 U.S.C. § 284;

(c) A finding that Bio-gen's induced infringement of the '035 Patent has been willful, and enhancement by three times of the damages determined by the jury or assessed by the Court;

(d) The entry of preliminary and permanent injunctions enjoining Bio-gen and its officers, directors, agents, servants, employees, parents, subsidiaries, affiliates, other related

business entities, and all other persons and entities acting in concert, participation, or in privity with Bio-gen, and its successors or assigns, from commercially manufacturing, using, offering to sell, or selling Lute-gen® within the United States, or importing Lute-gen® into the United States, or inducing such conduct, until the expiration date of the Asserted Patent;

(e)     A finding that this is an exceptional case entitling OmniActive to its reasonable attorneys' fees under 35 U.S.C. § 285;

(f)     An order for accounting of damages for Bio-gen's infringing acts;

(g)     An award to OmniActive of its costs, expert witness fees, and expenses in this action; and

(h)     Such other and further relief this Court deems just and proper.

Dated: June 23, 2025

Respectfully submitted,

By:   */s/ Amanda A. Abraham*
Amanda A. Abraham
aa@rothfirm.com
ROTH & ABRAHAM, PLLC
115 N. Wellington, Suite 200
P O Box 876
Marshall, Texas 75671-0876
Tel: (903) 935-1665
Fax: (903) 935-1797

Ranganath Sudarshan
Douglas A. Behrens
Robert T. McMullen
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Tel: (202) 662-6000

*Attorneys for Plaintiff*
*OmniActive Health Technologies Ltd.*